IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 23-cv-00958-GPG

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7,

    Plaintiff,

v.

DILLON COMPANIES, LLC,

    Defendant.

---

## ORDER

---

This matter is before the Court pursuant to the Plaintiff's (the Union) Motion for Preliminary Injunction (D. 4). The Court heard oral argument on that motion in a hearing on April 25, 2023, held an evidentiary hearing on April 28, 2023, and considered briefs submitted by the parties (D. 4, 23, 29, 30), along with the record to date. The Court DENIES the motion for the following reasons.

### I. FACTS[1]

Defendant Dillon Companies LLC (Dillon) operates numerous King Soopers and City Market grocery stores in Colorado and Wyoming. The Union is the certified bargaining agent of employees at some, but not all, of Dillon's stores. Dillon and the Union are parties to several collective bargaining agreements (CBA or contract) that govern various regions and stores. The

---

[1] The facts are derived primarily from the Complaint (D. 1), the briefing related to Plaintiff's motion for a preliminary injunction (D. 4, 23, 29, 30), as well as the facts established during the evidentiary hearing held on April 28, 2023 (D. 28).

1

parties introduced Defendant's Exhibit 7 (*see also* D. 5-1 at 45), an example of a CBA covering employees in unionized stores in Denver.[2]

The contracts contain several provisions that address what work must be assigned to bargaining unit members and what work may be performed by persons outside the bargaining unit. Those provisions include:

> Section 2: All work and services performed in the bargaining unit connected with the handling or selling of merchandise to the public shall be performed exclusively by bargaining unit members except . . . Field Merchandisers can perform all duties in the store.
>
> Section 3. Vendor Work: . . . [A]ll vendors may perform: any work in connection with promotional and seasonal displays; facing in connection with the service of product; rotation of product; cleaning of product, shelves, and racks; affixing coupons and other promotional materials. . . ."

(D. 5-1 at 48-49). The parties also made reference to Letter of Agreement #10 (Holiday Pay for Part-time Employees and Outdoor Bedding Plant Sales, Dated 4/6/89), which is attached to the contract and is construed as an additional provision thereof. It reads:

> . . . the parties have a dispute as to the permissible duties of GM/Non-food clerks with respect to the handling and sales of seasonal bedding plants items outside the plant and floral department . . . The sales of bedding plants and related items outside the store (and Christmas trees during the holiday season) shall be performed by Plant and Floral clerks of the store. In the event that Plant and Floral clerks don't exist in the location, or they have their hours maximized, then the company may utilize GM/Non-food clerks to perform the work at the GM/Non-food clerks' current rate of pay.

(D. 5-1 at 112).

---

[2] For purposes of this case, the Court assumes that all relevant CBAs have the same operative language.

The contracts have a multi-step dispute resolution procedure culminating in binding arbitration (D. 5-1 at 86-87). The contract provides that an arbitrator's award "shall not change, alter or modify any of the terms and conditions set forth in this agreement" (*id.* at 87).

The contracts contain certain limitations on how an arbitrator's award for improper work assignments by management may be implemented. Section 119 provides that:

> If an error is made by management in the application of the provisions of this Agreement resulting in a lost work opportunity for the aggrieved employee such as vendor stocking, scheduling and assignment of hours disputes, classification issues, and work jurisdiction matters . . . the employee shall be made whole by being permitted to work the number of hours lost. Such hours shall be above and beyond the posted schedule . . . An aggrieved employee may not demand such remedy on an overtime or premium-pay basis if the alleged violation occurred on what would have been a straight-time day for such employee. The employee must exercise this right to work within four (4) weeks of the settlement of error with the employee or such right shall be forfeited and no further remedy shall be required.

(D. 5-1 at 87).[3] During the hearing before the Court on April 25, 2023, counsel for Dillon noted that it would not waive Section 119 or "any argument that would be helpful to our client" (D. 26).

Dillon's stores have an outdoor area adjacent to the front doors that is occasionally referred to as the "front porch." For some number of years, during the period of approximately March through November, stores display and sell "seasonal plants" or "bedding plants" in the front porch area.

In 2022 and years prior, stores would purchase bedding plants from a supplier and take ownership of those plants upon delivery. Bargaining unit members, primarily from the Floral

---

[3] The Court does not interpret the language of these documents, but merely highlights the language that currently exists between and governs the parties. The Court must look at Section 119 in order to conduct its analysis regarding whether the arbitration remedy would be futile but does not interpret the language of the documents as that function is within the purview of the arbitrator.

Department, would be responsible for arranging the plant displays, watering and trimming plants, rotating stock, cleaning the front porch area, and discarding plants that had become unsellable. Merchandise that becomes unsellable for whatever reason is referred to as "shrink," and because stores owned the plants they sold, plants lost due to shrink reflected a revenue loss to the store.

Beginning in or about December 2022, Dillon entered into a new business arrangement for bedding plants with an entity called National Garden Services (NGS). Under this arrangement, sometimes referred to as "scan-based trading," NGS would retain ownership over the plants on display, much like a consignment arrangement. Customers would purchase plants through the stores' points of sale just like any other merchandise, and the store would keep track of those plant sales and remit a certain portion of the sales revenue back to NGS. Because NGS retained ownership of the plants until the point of sale, revenue losses due to shrink would be borne by NGS, rather than Dillon's stores.

On March 4, 2023, Dillon representative Jessica Quintana sent an email to various managers and others, announcing that "all outdoor Floral will be Scanned Based starting this Period with Spring 2023" (Def's Ex. 1, *see also* D. 5-1 at 382). The email attached a document entitled "Outdoor Floral SBT Transition One-Pager," which advised that "NGS 3d party merchandising service teams [have] been approved by the labor relations teams to service outdoor floral in all areas" (*id.* at 383). It further noted that NGS "will provide 3d party merchandising service including: watering plants; product rotation and culling/pruning/trimming/disposal; merchandising/displaying product; unloading [ ] trucks; building and maintaining fixturing; [and] cleaning the porch areas" (*id.*). Ms. Quintana's email included a line stating that "I will be sending more communication in the next few days on what the partnership will look like with [NGS] in our union locations" (*id.* at 382). It is undisputed, however, that stores did not receive further

4

guidance on this issue until April 24, 2023 (a full seven days after the Union initiated this civil action).

In or about March 2023, NGS shipments—and more importantly, NGS employees—began to arrive at stores. Eugene Wright, the Floral Department Manager at a King Soopers store in Colorado Springs, reported that an NGS employee named Marcia showed up at his store on March 24, 2023. Based on the instructions he had received in Ms. Quintana's March 4 email, Mr. Wright understood that Marcia should be permitted to engage in tasks like watering plants, trimming and culling, and performing "markdowns." Marcia also took down and reorganized bedding plant displays that Mr. Wright had created, finding that they were not compliant with NGS's intentions. Mr. Wright testified that it was his understanding that Marcia performed work at two stores for a total of 40 hours per week. The Court also heard testimony from Anthony Cox, a Floral Manager at a King Soopers store in Highlands Ranch. Mr. Cox testified that when NGS employees arrived at his location, there was "confusion" about what duties they were to perform. He testified that he observed NGS employees watering and culling/trimming bedding plants during this period but did not testify specifically as to the time frame involved.

The Union filed a series of grievances over the assignment of work involving bedding plants to NGS employees. The Union commenced this civil action on April 17, 2023, requesting an injunction prohibiting Dillon from assigning work relating to bedding plants to NGS employees or others outside the bargaining unit (D. 1). On April 24, 2023, Dillon published a document entitled "Outdoor Floral SBT—CBA Covered Guide, Associate Resource" (Def.'s Ex. 3). That document provided further direction as to how the involvement of NGS would be handled at unionized stores would be provided.

The sixth page of that document, entitled "Roles & Responsibilities: 'You' the Floral Associate," describes the tasks that must be performed daily by "Store Associates," that is, bargaining unit members: watering; plant culling and maintenance; "a merchandising refresh [ ] to re-fill displays [ ] and ensure compliance to the Period Planogram";[4] audit and replacement of signage as needed; porch cleaning tasks; and implementation of promotional programs as directed (*id*.). The page specifically states that "National Garden Service associates are not permitted to do any of the tables above or direct Store Associates at any time" (*id.*).

The next page of the document, entitled "Roles & Responsibilities: National Garden Service," sets forth the tasks that NGS employees are authorized to perform: remove the unsellable product from a designated disposal area,[5] collect empty racking for reloading on subsequent deliveries, conduct inventory counts to report back to NGS, "audit[ing]" NGS's products to ensure that they are correctly watered and culled, that they are being displayed according to the Planogram, and that signage on them is correct (*id*.). The document also indicates that NGS employees are authorized to "provide on-going training and support to seasonal & new hire," although it is not clear who the targets of that "training and support" are (i.e., bargaining unit members, NGS employees, or others).

---

[4] The Court understands a "planogram" to be a diagram that specifically reflects how Dillon and/or NGS want to have plants displayed to customers, indicating which plants will be displayed in a particular location on shelves or tables on the front porch.

[5] Both the document itself and the testimony at the evidentiary hearing seemed to indicate that bargaining unit members would initially identify plants that had become unsellable and would set them aside in a designated area. NGS employees would verify that the set-aside product is indeed unsellable and would then make a determination as to whether the product would be physically discarded (a task which would then be performed by a bargaining unit member) or whether the product would be returned to NGS. Although the document does not state as much, presumably, an NGS employee might also disagree that the product was unsellable and could instruct that it be returned to the front porch for display and sale.

The promulgation of the April 24 document clarifying the roles of bargaining unit members and NGS employees seemed to have an immediate effect. Mr. Wright testified that since that document was issued, the NGS employee known as Marcia is now at his store about two hours per day and that she is only involved in "auditing" the bedding plants displays. He stated that if Marcia determines that the watering of the plants is inadequate, she advises him and directs that more watering be done (by bargaining unit employees). Mr. Cox testified that since the April 24 document was issued, he has not seen any NGS employees at his store. Anthony Carleton, King Soopers' Floral Merchandiser (a corporate position overseeing approximately 150 stores and falling outside the bargaining unit), testified that he believed that the tasks that an NGS employee would perform at a unionized store would amount to about half an hour per day.

## II.  LEGAL STANDARD

The Norris–LaGuardia Act sets forth the "[f]ederal labor law policy prohibiting injunctions in peaceful labor disputes over arbitral issues." *Tchrs. Ass'n of Japanese Educ. Inst. of New York, Inc. v. Japanese Educ. Inst. of New York*, 724 F. Supp. 188, 191 (S.D.N.Y. 1989) (citing 29 U.S.C. §§ 101–115 (1982)). In 1970, the United States Supreme Court "allowed courts to consider the propriety of an injunction where necessary to preserve the arbitral process." *Id.* (citing *Boys Markets, Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235 (1970)); *see also Dillon Companies, Inc. v. United Food & Com. Workers Union Loc. No. 7*, No. CIVA. 09-CV-01364-P, 2009 WL 1795577, at *2 (D. Colo. June 23, 2009) (granting in part and denying in part Dillon's motion for a preliminary injunction against the Union). Generally, a court may not issue an injunction unless the court determines "that the ordinary principles of equity support injunctive relief." *Dillon Companies, Inc.*, 2009 WL 1795577, at *7.

In order to obtain injunctive relief in the Tenth Circuit within a *Boys Market* context, the movant must show: (1) the dispute is subject to mandatory arbitration under the labor contract; (2) the arbitrable dispute is the dispute underlying the lawsuit, rather than a collateral dispute; and (3) the moving party has demonstrated that it will suffer irreparable injury, that the balance of hardships favors it, and that it has a probability of success on the merits. *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Loc. 2-286 v. Amoco Oil Co. (Salt Lake City Refinery)*, 885 F.2d 697, 703 (10th Cir. 1989). In other words, "an injunction in aid of arbitration is appropriate . . . only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration." *United Gov't Sec. Officers of Am. Int'l Union v. Serv. Emps. Int'l Union*, 646 F. Supp. 2d 91, 94 (D.D.C. 2009) (citation omitted).

### III.  ANALYSIS

The Court has previously addressed the basis for its subject-matter jurisdiction in its prior Order (D. 27), and the contents of that Order are incorporated herein. The Court has jurisdiction pursuant to 28 U.S.C. §1331 and 29 U.S.C. §185(a).

Under the framework of *Amoco Oil Co.*, this Court applies the "frustration-of-arbitration" analysis when deciding whether an injunction should be issued in a labor dispute. *Amoco Oil Co.*, 885 F.2d at 702. Under that analysis, the Court "focuses on the effect the employer's action will have on the ability of the arbitrator to return the parties substantially to the status quo ante." *Id.* at 702. That analysis touches on many of the same factual considerations as the traditional equity factor of "irreparable harm," often to the point where the two inquiries "coincide[ ]." *Id.* at 704.

To demonstrate irreparable harm, the movant must show that it will suffer "an injury that would undermine the integrity of the arbitration process by making an eventual award only an empty victory." *Amoco Oil Co.*, 855 F.2d at 704. The question is not whether there is "any injury

resulting from a breach of contract that would not be fully redressed by an arbitral award," as "[w]hile awaiting a decision by the arbitrator on his grievance, an employee frequently suffers some injury that is not compensated by the contract remedies." *Loc. Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 285–86 & n. 12 (7th Cir. 1981). Rather, the injury must be one where "arbitration, unassisted by a *status quo* injunction, would be no more than a hollow formality." *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 931 (1st Cir. 1988) (internal quotations and citation omitted) (emphasis added).

As the Court's April 25, 2023, Order explained, in circumstances where a work assignment dispute involves a large number of potential hours or will occur over a prolonged period before arbitration could be completed, the limitations of Section 119 of the contract might present a situation in which an arbitral award in the Union's favor could prove to be little more than a "hollow formality" or "empty victory" (*see* D. 27 at 8-9). If, hypothetically, an arbitrator determined that Dillon improperly assigned 20 hours of work per week to NGS employees instead of bargaining unit members, and that practice continued for several months, the arbitrator's award might direct the restoration of 200 hours or more of work per store for bargaining unit members. But Section 119 of the contract requires that those hours be worked by the affected bargaining unit member(s) within a span of only four weeks, seemingly without allowing the unit members to move into an overtime status or otherwise exceed other scheduling limitations in the process. For all practical purposes, then, it would be impossible for bargaining unit members to enjoy the benefits of even a portion of an arbitral award granting them an entitlement to hundreds of hours

of remedial work.[6] As the Court previously ruled, under such circumstances, an injunction pending arbitration might be an appropriate exercise of the Court's authority under *Amoco Oil Co*.

The Court's analysis, however, changes in light of the April 24 document. There is considerable evidence that, prior to April 24, the only guidance that Floral Department managers had regarding the tasks that NGS employees would perform at unionized stores was Ms. Quintana's March 4 email. That email unambiguously indicated Dillon's intention that NGS employees would perform routine work such as watering, trimming, and maintaining bedding plant displays—work that historically had been assigned to bargaining unit members. Despite Ms. Quintana's email promising further guidance for unionized stores would be quickly forthcoming, no such guidance was issued for another six weeks. As a result, Floral Department managers like Mr. Wright and Mr. Cox reasonably understood Ms. Quintana's March 4 email as an instruction to allow NGS employees to perform tasks that the CBA reserves for members of the bargaining unit. Had that condition remained in effect, this Court might very well have concluded that the Union was entitled to the injunction it seeks. The Court, however, is cognizant that this is not the status quo that would be preserved by granting the injunction.

Moreover, injunctive relief, by its very nature, is a prospective remedy. To receive a forward-looking injunction, a party cannot simply show that they suffered harm in the past; rather, they must show a likelihood that the conduct sought to be enjoined is continuing to occur in the

---

[6] Although Dillon's counsel seemed to contend at oral argument that the Union could always request an alternative economic award from the arbitrator in such circumstances (e.g. an award of monetary damages), Dillon refused to concede that such an arbitrator could indeed make such an award, and the Court finds Dillon's argument on this point to be disingenuous. The Court is confident that Section 117 of the contract's prohibition on the arbitrator adding to or modifying the terms of the contract, as well as general principles of arbitration requiring awards to "draw their essence from the contract," would prevent any award in this dispute other than the remedial hours award contemplated by Section 119. *See E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000).

present or is likely to reoccur in the future. *See O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974)[7] ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief [ ] if unaccompanied by any continuing, present adverse effects" or a "prospect of future injury"). This Court cannot, by means of an injunction, craft a remedy that would compensate the Union for any improper work assignments by Dillon that occurred *prior* to the date the Court imposes the injunction. Such past harms are the exclusive province of arbitration under the parties' contract and subject to the remedial strictures thereof. The Court can only grant prospective injunctive relief if it finds that Dillon is likely to continue to improperly assign bargaining unit work to NGS employees. *See, e.g., Pecha by & through Pecha-Weber v. Lake*, 700 F. App'x 840, 847 (10th Cir. 2017).

On that point, the Court finds that the Union has not shown a likelihood of a future irreparable injury. The April 24 document, delayed as it may have been, clearly reflects Dillon's current policy that work traditionally performed by bargaining unit employees on bedding plants (e.g., watering, trimming, merchandising, etc.) will continue to be assigned to bargaining unit members and that such work will not be performed by NGS employees. The tasks that remain within NGS's purview, described primarily as "auditing," appear to be forms of abstract oversight of the bargaining unit staff that would traditionally be performed by members of Dillon's store management team or third-party merchandisers with an interest in how their product is being presented. Furthermore, Dillon's designation of non-bargaining unit supervisory work to NGS

---

[7] The Supreme Court in *O'Shea* made that observation in the course of assessing whether the plaintiffs, in that case, had standing to bring suit in the first place. *See O'Shea*, 414 U.S. at 495. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), the Court recognized that "case or controversy considerations obviously shade into those determining whether the complaint states a sound basis for equitable relief," and that "even if the complaint presented an existing case or controversy," the absence of a likelihood of future harm meant that "an adequate basis for equitable relief against petitioners had not been demonstrated." This Court has no reason to doubt that the Union had adequate standing to bring this action when it did, but the intervening changes in Dillon's policies operate to make the risk of future injury more remote and speculative and thus caution against granting preliminary injunctive relief.

instead of a Store Manager would also not appear to violate the contract for the same reasons. At the very least, the Union has not pointed to a contract provision or past practice that would suggest a contract violation in this event.

Furthermore, the Union's brief (D. 30) seems to concede that NGS employees are limited to "auditing" the outdoor bedding plant displays for adequacy, but argue that the scaling back of work by NGS still does not "alleviate[] . . . the problem of determining the appropriate number of people nor the limitation on when those hours could be worked" because "[e]ven if a part-time employee could physically double their schedule for a period of time, it is foolhardy to assume that they have the free time to do so considering their other employment and responsibilities" (D. 30 at 8). However, this contention is speculative, and the Court cannot grant the motion based on such an argument. *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) ("Plaintiffs seeking prospective relief must show more than past harm or speculative future harm.") (internal quotations and citation omitted).

Moreover, the Union's brief argues that "the expected job duties of [NGS employees] exceed [ ] auditing, as it also includes removing damaged or unsellable product from the division designated disposal area, collecting empty racks into the staging area for delivery date, and completed requested inventory counts" (D. 30 at 4-5). After reviewing the record, the Court does not find that Plaintiff established that this work involves bargaining unit work. Testimony at the evidentiary hearing established that bargaining unit members make the initial determination that the product is unsellable and then set it aside for an NGS employee's review. If the NGS employee agrees that the product is unsellable and needs to be discarded, the record reflects that a bargaining unit member then disposes of the product. In those circumstances, the NGS employee is not performing any bargaining unit work, as the bargaining unit member has already identified the

unsellable product, moved it to a pre-disposal area, and will eventually dispose of it.[8]  The sole function the NGS employee is performing is double-checking the bargaining unit member's decision-making.  The Union does not point to any provision of the contract that would prevent NGS from being able to independently observe and evaluate decisions that bargaining unit members make concerning NGS' products.

The same can be said of NGS taking its own inventory of bedding plants in the outdoor displays.  Mr. Carleton testified that Dillon's own policies require Floral Department employees to take inventories of product every four weeks, and that work is clearly performed by bargaining unit members.  But nothing in the contract would seem to prevent NGS employees from taking their own inventories of their own goods on whatever schedule they desire.  The record does not reflect that NGS uses its own inventory counts to undermine or negate the inventory counts performed by bargaining unit members, or even that NGS shares its inventory counts with Dillon in any capacity.  It may be that NGS is performing redundant or unnecessary work, but it is not usurping work that would otherwise be performed by members of the bargaining unit.  In the absence of NGS, that work would simply not be performed at all.

That leaves the argument that, by "collecting empty racks," NGS employees are performing bargaining unit work.  The record on this point is fleeting and unclear.   The April 24 document indicates that NGS employees are responsible for collecting "empty racking into a staging [ ] for delivery day reloading."  During his examination, Mr. Wright was asked to review the April 24

---

[8] The record reflects that, in lieu of disposal, the NGS employee may elect to have the product returned to NGS's warehouse.  In such circumstances, the NGS employee takes responsibility for transporting the product back to the NGS delivery truck.  There was some very limited discussion of what forms of merchandise loading and unloading are tasks reserved for members of the bargaining unit, but that discussion seems irrelevant here.  Although *Amoco Oil Co.* states that the "likelihood of success on the merits" element requires little more than a showing that a claim presents a colorable issue for arbitration, the Court cannot conclude that the Union can make even that minimal showing as it relates to a contention that NGS employees loading unsellable product onto a truck to be returned to NGS facilities operates to violate Section 2 of the contract. *See Amoco Oil Co.*, 885 F.2d at 703-04

document's listing of NGS responsibilities to identify "which in any way implicate somebody beyond you," which the Court understands to mean "which tasks were previously performed by bargaining unit members." Mr. Wright was asked about collecting the racks and whether he or his clerks were doing that task. Mr. Wright responded, "it's both." This suggests to the Court that prior to 2023, collecting empty racks was work that was traditionally performed by bargaining unit members. But when Mr. Carleton testified about the April 24 document, he stated that the

> "[C]ollecting empty racks" [language is] probably more broadly encompassing for Kroger [Dillon's overarching supermarket brand] as an enterprise. Our national footprint, this doesn't necessarily specifically apply to our division as we will unload the racks and [store] them in an area for pickup that's already predetermined, really no different from same time last year.

The Court is hard-pressed to determine whether the collecting of empty racks is or is not arguably bargaining unit work. As between Mr. Wright's and Mr. Carleton's testimonies, Mr. Wright's testimony seems to express more clearly that collecting empty racks was traditionally a bargaining unit function, such that assignment of that task to NGS employees might violate the terms of the contract; however, the situation is far from clear. Even so, the record provides no estimate of how often NGS employees are performing this work and how much time it consumes.

But even if this task is bargaining unit work, the Court does not find that this work alone would be so time consumptive that any arbitral award of cumulative hours would amount to frustration or vitiation of arbitration in light of Section 119. As previously discussed, an arbitration award in a work assignment case might be rendered illusory by Section 119's limitations on how those awards are implemented, but only in cases where the number of hours involved is especially large. If the work of collecting empty racks accounts for mere minutes per day or per week, it may be possible for an arbitrator to render an effective award for that minimal amount of misassigned work, even within the limitations imposed by Section 119. Ultimately, because the Union bears

14

the burden of proof when seeking an injunction in this context, the lack of clarity in the record relating to the collection of empty racks works to the Union's detriment, and the Court cannot conclude that this issue alone suffices to satisfy *Amoco Oil*'s "frustration of arbitration standard."

The Court is mindful that the Union is at some degree of a disadvantage insofar as Dillon's April 24 document reflected a policy change that was in place for only four days before the April 28 evidentiary hearing,[9] and the precise manner in which that policy would be implemented may be yet to fully come into focus. It may be that, in time, the Union may develop evidence of large-scale or systemic[10] violations of the policy, at which point the Court would be amenable to reopening this matter to reconsider the necessity of granting injunctive relief.

## IV. CONCLUSION

Accordingly, the Union's Motion for Preliminary Injunction (D. 4) is **DENIED**. Because the resolution of the issue of preliminary and permanent injunctive relief preserving the status quo is appropriately consolidated with a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), the Court construes the resolution of the Union's motion as resolving this matter on the merits as well.

Accordingly, the Clerk of the Court shall enter judgment in favor of Dillon on the Union's Complaint and shall administratively close this case. Should the status quo change as delineated in this Order, Plaintiff is free to reopen the case and file a second motion for a preliminary

---

[9] The Court expresses no opinion on the Union's suggestion that the implementation of that policy well after this action was commenced represents gamesmanship or bad faith on Dillon's part. What is apparent to the Court is that relations between the parties (or perhaps simply between counsel) are particularly acrimonious and may have prevented the parties from productively resolving the issues in this case via good-faith discussion.

[10] To be clear, the Court is not inviting additional motion practice because of isolated or even occasional instances in which NGS employees perform small amounts of arguable bargaining unit work. The Court will reserve its power to reopen this matter only in situations where the Union can clearly demonstrate that Dillon is disregarding the status quo now established by the April 24 document (1) regularly, (2) in multiple stores, and (3) to a degree implicating considerable numbers of employee hours each week.

injunction. The Court, however, will not entertain a motion for an ex parte temporary restraining order given the acrimony apparent to the Court.

DATED May 3, 2023.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

injunction. The Court, however, will not entertain a motion for an ex parte temporary restraining order given the acrimony apparent to the Court.

DATED May 3, 2023.

BY THE COURT:

Gordon P. Gallagher
United States District Judge